UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RUSSELL AND STACEY SCHMIDT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO: 4:18CV769 HEA |
| | ) | |
| UNITED AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss Pursuant to 12(b)(6), [Doc. No. 11]. Plaintiffs oppose the Motion. For the reasons set forth below, the Motion will be granted.

### Facts and Background[1]

For the purposes of the Motion to Dismiss, the following facts, taken from Plaintiff's petition, are taken as true.

The plaintiffs' minor daughter suffered injuries in a car wreck that left her paralyzed and required to use a wheelchair. Plaintiffs' daughter used a common electric wheelchair.

In December of 2016, the Schmidt family was scheduled to go on a vacation that included a Disney Cruise. They were to fly on United from St.

---

[1] The recitation of facts is set forth for the purposes of this motion only. It in no way relieves the parties of the necessary proof thereof in later proceedings.

Louis to Houston and then, after their vacation, back from Houston to St. Louis.

The Schmidt family's travel arrangements had them leaving St. Louis on December 23, 2016.

On December 9 and again on December 16, Mr. Schmidt called United and spoke with a member of the customer care staff about needing to stow the electric wheelchair on the airplane. He told United about the wheelchair and was repeatedly assured that United "deals with this all of the time" and was told not to worry. United never asked for the make and model of the wheelchair.

When the Schmidt family arrived at the United desk at Lambert on December 23, they again asked about the wheelchair. Again, they were told not to worry. After seeing the wheelchair, no one from United ever commented that there was anything unusual or unforeseeable about it.

Given the minor child's disability, the Schmidt family was pre-boarded on their flight. After the plane was loaded, Mr. Schmidt was told he was going to have to help the baggage handlers load the wheelchair. In front of all of the passengers, he was escorted off the plane and taken down on to the tarmac to help load the wheelchair onto the plane. Mr. Schmidt helped the baggage handlers lift the 400 pound wheelchair up onto the conveyor belt ramp. He then helped the baggage handlers guide the wheelchair up the ramp, only to find that it would not fit under the jet engine.

The baggage handlers did not have any idea how to handle the situation. Mr. Schmidt told everyone they needed to partially disassemble the wheelchair to get it into the cargo hold. A tool kit was found, but not before a United employee angrily confronted Mr. Schmidt for being on the tarmac. Once that situation was resolved, Mr. Schmidt partially disassembled the wheelchair and helped the baggage handlers get the chair in the cargo hold.

Thereafter, Mr. Schmidt was escorted back to the plane, which was now an hour late taking off. He was jeered and booed by some of the passengers on the plane.

After arriving at Houston, the baggage handlers were able to unload the wheelchair without involving Mr. Schmidt. However, Mr. Schmidt had to help the baggage crew remove the wheelchair from the conveyor and then, wait for nearly an hour while United personnel found the tools needed to reassemble it.

Three days into their vacation, the wheelchair began to malfunction due to damage sustained on the flight from St. Louis to Houston.

Given that they were out at sea and there was not a replacement wheelchair available, Mr. Schmidt did what he could to keep the wheelchair functional for his daughter. The malfunctioning wheelchair caused significant problems and issues for the Schmidt family during and after their vacation.

The Schmidt family's return flight from Houston to St. Louis was on

December 29. The Schmidt family arrived at the airport around 12:10 that afternoon for their 3:25 flight home. They checked their bags, cleared security and proceeded to the gate for their flight to let the gate agent know about the wheelchair. "No problem . . . we deal with this situation all of the time" was the response.

Inexplicably, the flight was delayed from 2:25 until 5:25 that afternoon. This created an enormous problem. Plaintiff's daughter has a feeding tube. The Schmidt family was required to check their baggage that contained her food. This presented a serious health issue for Plaintiff's daughter, as young people with feeding tubes require meals at certain times to help facilitate their bowel programs and their catheter routines. After far too much time and debate, the gate agent finally went on the plane and retrieved her food.

The flight was delayed another hour. No one in the Schmidt family was offered food vouchers, unlike other passengers who were waiting on the delayed flight.

When the boarding process started, Mr. Schmidt again reminded the gate agent about his daughter's wheelchair. Again, he was told not to worry and that United dealt with wheelchairs routinely. However, the baggage handler who came to get the wheelchair had no idea what he was doing. The Schmidt family was boarded on the plane, trusting that United could safety handle and transport the

wheelchair. The flight was delayed even longer as the baggage handlers struggled to load the wheelchair.

Despite being assured that the wheelchair would be loaded last in Houston so that it could be unloaded first and waiting for the Schmidt family, when they got off of the plane in St. Louis that proved not to be the case. The Schmidt family waited for the wheelchair well after all of the other passengers had left.

When the wheelchair arrived, it was in pieces. Several important components were missing. Other components were broken.

Plaintiffs' Count I is a claim for negligence. Count II is a claim for negligent misrepresentation; Count III is brought for alleged fraudulent misrepresentation/fraudulent inducement/fraud. Count IV is a claim for violations of the Missouri Merchandising Practices Act, ("MMPA"). Plaintiffs seek compensatory damages, punitive damages, and costs. Plaintiffs additionally seek attorneys' fees under the MMPA.

Defendant moves to dismiss Counts II-IV in their entirety and Count I to the extent it relies on interactions with Defendant's agents and representations made to Plaintiffs. Defendant does not move to dismiss the property damage claim contained in Count I. Defendant further seeks dismissal of Plaintiffs' punitive damages claim. As grounds for dismissal, Defendant argues that Plaintiffs' claims are preempted by the Air Deregulation Act of 1978.

## Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). To satisfy this requirement, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Corrado v. Life Inv'rs Ins. Co. of Am.*, 804 F.3d 915, 917 (8th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678), *cert. denied*, 135 S. Ct. 2941 (2015). The complaint's factual allegations must be "sufficient to 'raise a right to relief above the speculative level.'" *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555). The Court must accept factual allegations as true, but it is not required to accept any "legal conclusion couched as a factual allegation." *Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 373 (8th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ash v.

*Anderson Merchandisers, LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678), *cert. denied*, 136 S. Ct. 804 (2016).

On a motion to dismiss, courts must rule "on the assumption that all the allegations in the complaint are true," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 555, 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Determining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 923 (8th Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679).

## Discussion

### AIRLINE DEREGULATION ACT OF 1978

"It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712 (1985) (internal citations omitted). This invalidation is accomplished by way of federal preemption, which "is invoked under the directive of the Supremacy Clause." *Brown v. Hotel and Rest. Emps. and Bartenders Int'l Union Local 54*, 468 U.S. 491, 500 (1984); *see also Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625,

630 (2012) (stating preemption of state law occurs through the direct operation of the Supremacy Clause).

Under the Supremacy Clause, federal law may supersede, or preempt, state law in several different ways: (1) Congress may expressly state that federal law preempts state law (express preemption); (2) Congress' intent to preempt state law may be inferred from its comprehensive regulation of an area of law (field preemption); or (3) state law may actually conflict with the federal law (conflict preemption) – i.e., where compliance with both federal law and state law is impossible, or where the state law stands in the way of the accomplishment and execution of the purposes and objectives of Congress. *Hillsborough*, 471 U.S. at 713; *see also Gunter v. Farmers Ins. Co., Inc.*, 736 F.3d 768, 771 (8th Cir. 2013). Congress may evince its intent to pre-empt state law either implicitly or explicitly. *Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516 (1992). Federal regulations can have the same preemptive effect as federal law. *Gunter*, 736 F.3d at 771-72.

The ADA contains an express preemption clause which provides as follows:

> (b) Preemption.--(1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

The United States Supreme Court has on three occasions offered important guidance as to how the ADA's express preemption clause is to be construed. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, (1992); *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995); *Northwest, Inc. v. Ginsberg*, 572 U.S. 273 (2014). The ADA was enacted in 1978 after Congress determined that deregulation of the airline industry would lead to greater reliance on market forces resulting in greater efficiency, innovation, lower prices, and enhanced quality and variety of air transportation services. *Morales v. Trans World Airlines, Inc.*, 504 U.S. at 378. In order to prevent the states from circumventing federal deregulation by enacting their own regulation of the airline industry, Congress included a broad preemption clause in the ADA prohibiting the states from enforcing any law or regulation related to an air carrier's rates, routes, or services. *Id.* at 383-84. In *Morales*, the Court held that the ADA expressly preempted the application of state deceptive business practice laws to airline fare advertisements because such regulation related to the content and format of air carrier fare advertising and had a significant impact thereon. *Id.* at 388-91. The Court explained the ADA's broad preemption clause meant state laws and regulations "having a connection with or reference to airline rates, routes, or services, are pre-empted" by the ADA. *Id.* at 384. More importantly, even an indirect effect occasioned by laws of general applicability is sufficient to meet the "relating to" language in the preemption clause. *Id.* at 386-

87. Laws which are consistent with the ADA's purpose are preempted nevertheless. *Id.* However, the Supreme Court noted that in some cases the regulations might have too tenuous or remote an impact to be preempted. *Id.* at 387, 390.

The Supreme Court reaffirmed in *Wolens*, 513 U.S. at 224 the breadth of the ADA's preemption clause. In *Wolens*, the plaintiffs were participants in American Airlines' frequent flyer program who claimed to be injured by modifications to the program and brought suit claiming breach of contract and violation of the Illinois Consumer Fraud Act. *Id.* at 224-25. The Court held the Illinois Consumer Fraud Act claims were preempted by the ADA while the breach of contract claims were not preempted. *Id.* at 226. The Court explained that the frequent flyer program in question related to rates because the airline gave mileage credits for free tickets and upgrades and services and because the program provided access to flights and service class upgrades regardless of capacity controls and blackout dates. *Id.* The Court noted the Illinois Consumer Fraud Act was prescriptive, controlled conduct, and served as a means of policing the marketing practices of airlines. *Id.* at 227-28. Given the text and purpose of the Illinois Consumer Fraud Act, it was preempted by the ADA. *Id.* at 228. The breach of contract claims on the other hand were not preempted because a breach of contract claim does not allege a violation of a state-imposed obligation but rather alleges violation of a self-imposed obligation. *Id.* The terms and conditions of a frequent flyer program are privately ordered

obligations. *Id.* ADA preemption only applies to state laws and regulations. *Id.* at 229. The Court stressed that the purpose of the ADA was to promote market efficiency and the ability to enforce private contracts through a breach of contract action was fundamental to a stable and efficient market. *Id.* at 230. Any sensible construction of the ADA required that agreements freely made not be preempted.

In *Ginsberg*, 572 U.S. at 276, the Supreme Court held that an airline customer's claim for breach of the implied covenant of good faith and fair dealing was preempted by the ADA. The airline had terminated the customer's membership in the airline's frequent flyer program based on alleged abuse of the program. The customer sued alleging, among other things, the termination of his membership violated the implied covenant of good faith and fair dealing. *Id.* at 278. The Court explained that even state common law rules like the implied covenant of good faith and fair dealing are preempted by the ADA because the ADA preemption provision was very broadly worded, and exempting common law claims would be contrary to the central purpose of the ADA. *Id.* at 281-82. The Court stressed that what was important was the effect of the state law, provision, or regulation and not its form and state common law rules can undermine the purpose of the ADA just as surely as statutes and regulations. *Id.* at 283, 134 S.Ct. 1422. The Court further explained that the claim in question was clearly related to "rates, routes, or services" because the plaintiff sought reinstatement in the airline's frequent flyer

program so that he could accrue mileage credits which could be redeemed for tickets and upgrades. *Id.* at 283-84. In addition, the implied covenant claim was a state-imposed obligation rather than one the parties voluntarily undertook because the parties cannot contract out of the covenant. *Id.* at 285-86.

State laws and regulations "having a connection with or reference to airline rates, routes, or services, are pre-empted" by the ADA. *Morales*, 504 U.S. at 384. The phrase "relating to" in the ADA preemption clause has been construed very broadly. *Id*, at 384. For instance, the ADA has been found to preempt a New York law which required airlines to provide fresh air, restroom, water, and food to passengers subject to lengthy ground delays. *Air Transport Ass'n of Am. v. Cuomo*, 520 F.3d 218, 222 (2nd Cir. 2008) (finding the required accommodations related to the service of an air carrier).

Insofar as Plaintiffs contend the ADA does not preempt their state law claims of negligence misrepresentation, fraudulent misrepresentation, fraud and the MMPA because they argue that the claims do not seek to change what is required of defendant with respect to the transportation of disabled passengers and their assistive devices, rather, they seek damages for the failure to meet minimum standards, the Court finds the argument unpersuasive, unsupported by case law, and contrary to *Morales*, *Wolens*, and *Ginsberg* which broadly construed the ADA's preemption provision. *See Watson v. Air Methods Corp.*, 870 F.3d 812, 817

(8th Cir. 2017) (noting there is no presumption against preemption and ADA preemption applies to both generally applicable state law and state laws which specifically apply to air carriers). The plain language of the ADA preemption provision which preempts state laws "related to a price, route, or service" forecloses Plaintiffs' damages argument. The claims presented herein are precisely the types of claims the ADA preempts. Plaintiffs' claims are fundamentally related to the services Defendant provides: the handling of cargo in the aircraft. Plaintiffs allege Defendant misrepresented the services that it renders in transporting the cargo. Indeed, as Defendant correctly argues, each aspect of the complained of actions, from answering telephone calls, checking Plaintiffs' wheelchair, transporting the wheelchair, to the treatment of Plaintiffs during their ordeal relate to services. As such, the claims undeniably fall within the preemption umbrella of the ADA.

The Court concludes, as a matter of law, that Plaintiffs' claims, with the exception of the damage claim to the wheelchair, are preempted by the Airline Deregulation Act of 1978.

**Punitive Damages**

Plaintiffs' remaining claim for damage to the wheelchair includes a claim for punitive damages. Defendant includes within its Motion to Dismiss an argument seeking to "dismiss" the punitive damage request. Plaintiffs argue in response that

a demand for punitive damages is not a "claim," rather, it is a form of relief, and therefore it is not subject to a Rule 12(b)(6) dismissal motion.

Rule 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The court "enjoy[s] liberal discretion to strike pleadings under Rule 12(f)." *BJC Health Sys. v. Columbia Cas. Co.,* 478 F.3d 908, 917 (8th Cir.2007). "[A] prayer for relief not available under the applicable law, or which asserts a damage claim in excess of the maximum recovery permitted by law, is properly subject to a motion to strike." *Spinks v. City of St. Louis Water Div.,* 176 F.R.D. 572, 574 (E.D.Mo.1997) (striking a claim for punitive damages against a municipality because such damages were not permitted by law). However, "Striking a party's pleading ... is an extreme and disfavored measure." *BJC Health Sys.,* 478 F.3d at 917 (citing *Stanbury Law Firm, P.A. v. IRS,* 221 F.3d 1059, 1063 (8th Cir.2000)).

Defendants seek to strike Plaintiff's claim for punitive damages claim. Defendant argues that Plaintiffs' negligence claim does not contain sufficient facts to support a claim for punitive damages. Under Missouri law, "[p]unitive damages can be awarded in a negligence action." *Litchfield v. May Dep't. Stores Co.,* 845 S.W.2d 596, 599 (Mo.Ct.App.1992) (citing *Hoover's Dairy, Inc. v. Mid–America Dairymen,* 700 S.W.2d 426, 436 (Mo. banc 1985)). However, to obtain punitive damages, the plaintiff must show that the defendant "'knew or had reason to know

that there was a *high degree of probability* that the action would *result in injury.*'" *Alack v. Vic Tinny Int'l. of Mo., Inc.,* 923 S.W.2d 330, 338 (Mo. banc 1996) (quoting *Hoover's Dairy,* 700 S.W.2d at 436). Punitive damages "cannot be collected unless the defendant showed complete indifference to or conscious disregard for the safety of others." *Id.* at 339 (internal quotation marks omitted). Plaintiffs claim that Defendant told them they could handle the transportation of the wheelchair because this situation occurred "all the time." The Court is unable to even infer that these statements could rise to the level of intentional or reckless disregard for Plaintiffs' rights or safety. The court finds that these allegations alone, accepted as true, do not contain "sufficient factual matter" to state a claim for punitive damages that is "plausible on its face," as required under *Iqbal*. Plaintiffs' demand for punitive damages must therefore be stricken.

## Conclusion

Based upon the foregoing analysis, the Motion to Dismiss is well taken. Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss, [Doc. No. 11] is **GRANTED**.

**IT IS FURTHER ORDERED** that Counts II through IV of the Petition are dismissed.

**IT IS FURTHER ORDERED** that Count I remains pending with respect to Plaintiffs' property damage claim.

**IT IS FURTHER ORDERED** that Plaintiffs' claim for punitive damages in Count I is stricken.

Dated this 27th day of February, 2019.

_____
 HENRY EDWARD AUTREY
 UNITED STATES DISTRICT JUDGE